

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00165-CR

_____

KEVIN NASH, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F21-845-211

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

A jury convicted Kevin Nash of sexually assaulting his wife, F.O. (Remi)[1] on March 20, 2020. In three issues, he argues that the trial court abused its discretion by permitting Remi to testify, that the trial court abused its discretion by allowing the jury to hear testimony about the contents of text messages sent by Nash to Remi, and that the evidence is insufficient to support his guilt. We will affirm.

### Background

Around 4:00 a.m. on April 17, 2020, Remi called 911 in Denton County to report that she felt that her life was in danger from her husband, Nash. Remi told the dispatcher that her husband had been physically and sexually assaulting her since the previous day.

Denton Police Department officers Jeffrey McAdams and Thomas Maloney were dispatched to the address. McAdams testified at trial that when he and another officer arrived, Remi seemed very "shaken up," "like someone who had been through something hard." Based on what Remi told McAdams, the officers did not believe that they could arrest Nash for anything that had happened that evening because any assault that may have occurred had not caused any apparent bodily injury, but it appeared to McAdams that a different offense had happened previously on March 20. Specifically, Remi made an outcry of a prior sexual assault, and she showed McAdams

---

[1]We use a pseudonym for the complainant to protect her privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

some text messages from March 2020 that she said were from Nash. To McAdams, the messages "indicated [that] an offense had occurred that corroborated what she was saying." McAdams said that in one of those messages, the sender referred to himself by name (Nash) and as "your loving husband." McAdams considered the general nature of the messages to be threatening, and he became concerned for Remi's safety. He and Maloney connected her to a local shelter for domestic violence victims so that she could stay somewhere away from Nash.

Maloney testified that although the officers determined that whatever acts had occurred that morning would have constituted a Class C assault, for which Denton police did not make arrests as a matter of policy, Remi told them that she was scared because of things that had happened before that evening. Maloney also saw the text messages that Remi showed to McAdams, and Maloney believed those messages corroborated what she had told them; Maloney "was shocked reading them." After the officers connected Remi with a shelter, they wrote up the information that they had gathered in a report to be investigated by department detectives.

Denton Police Detective Marquilla Curtis was assigned to investigate the sexual assault that Remi had reported, and Curtis testified about her investigation. As part of Curtis's investigation, she interviewed Remi, and based on that interview, Curtis believed that an offense had occurred on March 20. Remi allowed Curtis to examine her cell phone, and a forensic examiner downloaded data from the phone; as discussed in more detail below, the data included text messages sent from Nash's cell

phone number. In one of the messages, the sender apologized for forcing himself on Remi. In another, the sender threatened her with sexual assault.

After the grand jury indicted Nash for the March 20 sexual assault, the State notified Nash that it intended to use for enhancement purposes his 2014 felony conviction for assault causing bodily injury–family violence.

At trial, the State called Remi as a witness. Remi initially refused to testify but then admitted that on March 20, 2020, Nash had tried to have sex with her without her consent. However, she initially denied that he had succeeded. At that point, the prosecutor approached the bench and advised the trial court that he wanted to take a break to allow Remi to watch the video from her interview with Detective Curtis so that the State could impeach Remi's testimony. In response, the trial court released the jury for lunch, cautioned Remi that lying under oath is an offense, and appointed an attorney to advise her of her rights.

During the break, Remi was shown the video of her police interview. Then, when the trial resumed, Remi opted to continue testifying and to correct her earlier testimony. She admitted to the jury that Nash had sexually assaulted her.

The jury found Nash guilty and assessed punishment at thirty-seven years' confinement. The trial court sentenced him accordingly.

**Discussion**

## I. Admission of Evidence

### A. Standard of Review

Nash's first two issues challenge the trial court's admission of evidence. We review for an abuse of discretion the trial court's admission of evidence, meaning that we will uphold the trial court's ruling as long as it falls within the "zone of reasonable disagreement." *Kirk v. State*, 421 S.W.3d 772, 781–82 (Tex. App.—Fort Worth 2014, pet. ref'd).

### B. Remi's Testimony

In Nash's first issue, he asserts that the trial court abused its discretion when it allowed the State to call Remi for the sole purpose of placing otherwise inadmissible evidence before the jury under the guise of impeachment.

#### 1. Background

To properly address Nash's arguments under this issue, we first set out some of the prosecutor's questions to Remi and her responses. Remi testified at trial only because she had been subpoenaed by the State, and initially, she stated that she would not testify at all. In response, the prosecutor asked the trial court to direct Remi to answer his questions. Rather than simply ordering her to do so, the trial court cautioned Remi outside the presence of the jury that her only obligation was to testify truthfully and that if the court were to order her to answer questions and she refused, she could be held in contempt.

When the jury was brought back in, the prosecutor began questioning Remi about the events on March 20. During that testimony Remi first testified that on that evening, Nash had tried to have sex with her without her consent, but that he had not succeeded:

> [Prosecutor]. So that night, on March 20th, did he have sex with you—
>
> [Remi]. No.
>
> Q.—without your consent?
>
> A. He never—he didn't have sex with me. He just was trying. He's my husband.
>
> Q. So your testimony here today is that on March 20th, 2020, he did not actually penetrate, did not have sex with you that evening?
>
> A. I don't think so.
>
> Q. Do you recall speaking to a detective in this case?
>
> A. I can't remember that, no.
>
> Q. I'm sorry? Could you repeat that?
>
> A. I can't remember.
>
> But that was not an okay thing that happened. The thing that happened wasn't —was quite different from what you're asking me. The reason why I called police . . . was not that case. It was—that was about a month apart.
>
> [Prosecutor]. But do you remember talking to police about what happened on March 20th when they came to your house a month later?
>
> A. Yeah, when I was in their custody. That was when—because he was sending some [text] messages to me, and the police was beside me, worried. And they—they saw that, and I have to explain it. I said it.

*Q.* So do you remember telling officers that you had been sexually assaulted?

*A.* I didn't state it that way. I just explained his behavior and what happened all along.

*Q.* So I want to make sure I'm clear. Your testimony is you were not sexually assaulted, he did not have sex with you, and you did not tell any officers that, right?

*A.* I can't remember because—I can't remember, but I remember I said he forced me. But I kind of advised—I say that.

. . . .

*Q.* (BY [the prosecutor]) Do you remember meeting with the detective, Detective Curtis, in this case?

*A.* When was that, sir?

Q. It was about—towards the end of April of 2020. A little more than a month after March 20th.

*A.* Yes, I think.

*Q.* Do you remember going to the police department and sitting down and having a conversation?

*A.* Yeah.

*Q.* And were you truthful during that conversation?

*A.* I—I can't remember most of it. I can't remember most things, because they were asking me questions. I can't remember everything I said. I can't recall it.

*Q.* Do you feel like you told the truth?

*A.* Yeah. I told them whatever happened, yeah.

*Q.* And do you recall a meeting with me and with other personnel from the DA's Office last week?

*A.* Yes. And you asked me the same question, and I think I—I remember I said—you asked me if he had sex with me that night, and I said no.

. . . .

*Q.* (*BY* [the prosecutor]) So your testimony is, in a meeting that we had in our office last week—

*A.* Uh-huh.

*Q.* —you did not claim that you had been sexually assaulted by Kevin Nash?

*A.* You asked me the question that—what happened that night, and I—I said it. I came to the room, and he was trying to have the way on me[.] . . . So you asked me if he had his way that night, and I said I never say no. You asked me if he had sex with me that night. I remember I say no.

. . . .

[Prosecutor.] Your Honor, may we approach?

At the bench, the prosecutor told the trial court that it had the video of Remi's interview with the detective that would be useful for impeachment, and therefore the prosecutor wanted "the opportunity to [take a] break and allow [Remi] to review that" before impeaching her testimony. At that, the trial court sent out the jury for lunch, and Nash's attorney made the following argument to the trial court objecting that Remi should be struck as a witness:

> In the discovery we received from the DA, their notes specify some things that, when they asked her, her answers—which are different from her testimony today. And I think—and I understand the State has a witness now that's an uncooperating witness, but at this point, I think she's already—also became a witness that they can't present if she's—if they're aware that she's not telling the truth from their interview last

8

week regarding conflicts with her testimony today. And any further submission of this witness to questioning, she's already shown herself to be a not truthful witness, and we move to strike this witness for those reasons.

*THE COURT:* I understand your thoughts on that, and I'm not 100 percent convinced based upon what I've heard today from the witness. I understand she doesn't want to be here.

And to be honest, I'm not sure I exactly—understood exactly what you were saying. I was having a tough time understanding you. . . . But I think what I'm going to do out of an abundance of caution, now that we've broken for lunch—but I need to ask [Remi] a few questions.

The trial court proceeded to ask Remi if she had an attorney to represent her— she answered that she did not—and if she understood that it is a criminal offense to lie under oath, to which Remi responded, "I just understand now." The court then offered to appoint her an attorney to advise her of her rights before the trial resumed again after lunch, and Remi accepted that offer.

After the lunch break, Remi told the trial court that she had met with the appointed attorney, who informed her that she had three options: to remain silent, to stick to her previous testimony, or "if it is true, to clear up any misrepresentation [from] anything that [she had] said th[at] morning and just to stick to the truth." Remi indicated that her choice was to clear up the misrepresentation.

The trial court then asked her if she understood that she had the option to assert her Fifth Amendment privilege. She answered, "Yes, I do." After establishing that Remi understood her right to remain silent, the court asked her if watching the

9

video during the break had changed her testimony, and Remi said that it had. The trial court then brought the jury back.

When the State resumed its questioning, the prosecutor again asked Remi about the events of March 20. In her answers, Remi changed her earlier testimony about what had happened that day:

> *Q.* I want to ask you a few questions about, kind of, your earlier testimony. During the break, did you have an opportunity to review a video of you speaking with the detective in this case?
>
> *A.* Yes.
>
> *Q.* And based on that, is there a portion of your testimony that you would like to change?
>
> *A.* Yes.
>
> *Q.* And when I asked you, before lunch, on March 20th, you know, what had happened, just to review your testimony, was it your testimony at that time that Kevin Nash held you down but did not ultimately have sex with you? Is that what your testimony was before lunch?
>
> *A.* Yes.
>
> *Q.* And so I want to ask you again now. On March 20th, when you described him holding you down on the bed by your wrists, did he also penetrate—
>
> *A.* Yes.
>
> *Q.* —your vagina—hold on just one moment, please.
>
> Did he also penetrate your vagina with his penis?
>
> *A.* Yes.

### 2. Analysis

Nash argues that Remi's testimony should have been struck under *Hughes v. State* because the State called Remi to testify, despite knowing that she would deny the offense had occurred, in order to introduce otherwise inadmissible testimony. *See* 4 S.W.3d 1, 7 (Tex. Crim. App. 1999). The State counters that Nash's objection to Remi's testimony did not preserve the complaint on appeal. *See* Tex. R. App. P. 33.1. We agree with the State that Nash's trial objection appeared to be that Remi should be struck as a witness because the State knew her testimony to be untruthful, rather than the complaint based on *Hughes* that Nash now urges on appeal. However, even assuming that the objection was sufficient to preserve this issue, we nevertheless conclude that the issue is without merit.

In *Hughes*, the complainant's mother had testified at a pretrial hearing that her daughter had not told her about any abuse by the mother's husband, the complainant's stepfather. 4 S.W.3d at 2–3. However, the mother had previously admitted to two caseworkers that not only had her daughter told her about the abuse, but that her husband had confessed when she confronted him about it. *Id.* at 3. At trial, the State was faced with no way to put before the jury that the defendant had confessed to the complainant's mother; the mother had already denied it under oath at a pretrial hearing, and no hearsay exception would allow the caseworkers to testify about what the mother had told them. *Id.* at 6. Undeterred, at trial the State called the mother to testify so that when, as expected, she again denied being told about the

abuse, the State could call the caseworkers to impeach the mother's testimony, thereby putting before the jury the caseworkers' otherwise inadmissible testimony. *Id.* at 3.

On appeal, the Court of Criminal Appeals noted that the State had failed to offer any explanation for why it expected the mother to testify differently than she had at the pretrial hearing and that "the State elicited no favorable testimony from [the mother]," which "suggest[ed that] the State was attempting to use [the mother's] prior inconsistent statements under the guise of impeachment for the primary purpose of placing before the jury evidence [that] was not otherwise admissible." *Id.* at 7. The court held that under those circumstances, the admission of the mother's prior inconsistent statements through the caseworkers' testimony was more prejudicial than probative and therefore should have been excluded. *Id.* The court concluded that "the State's knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403" of the Texas Rules of Evidence and that "a trial court abuses its discretion under Rule 403 when it allows the State to admit impeachment evidence for the *primary purpose* of placing evidence before the jury that was *otherwise inadmissible*." *Id.* at 5 (emphasis added); *cf. White v. State*, No. 02-21-00059-CR, 2022 WL 623450, at *6 (Tex. App.— Fort Worth Mar. 3, 2022, no pet.) (mem. op., not designated for publication) (distinguishing *Hughes* on the basis that the evidence complained of by the defendant "was otherwise admissible under an exception to the hearsay rule").

12

Here, on the other hand, the prosecutor did not use Remi as a work-around to enable admission of otherwise inadmissible evidence. As the State points out in its brief, the prosecutor elicited favorable information from Remi. Even before the break during which Remi watched her interview video, Remi testified that when Nash had come home that evening, he tried to have sex with her and that she had asked him to stop. After watching the video and consulting with an attorney, she further testified that on that night, Nash had held her down and penetrated her vagina with his penis, that she had told him to stop, and that he covered her mouth with his hand to stop her from screaming. Further, the prosecutor did not seek admission of the video of Remi's police interview. The only previous statement referenced by the prosecutor in front of the jury was when the prosecutor asked Remi if she remembered telling officers that she had been sexually assaulted. Remi herself testified about the offense. The record does not indicate that the State used Remi to admit otherwise inadmissible evidence.

Nash's argument under this issue implicitly recognizes that this situation is different from *Hughes* because Nash's real complaint appears to be not that Remi's testimony allowed the State to introduce otherwise inadmissible statements that Remi had made to police, but rather that Remi herself testified about the offense. Nash acknowledges as much when he complains that Remi was "basically intimidated by the State and the court to change her testimony again."

13

To argue intimidation, Nash's brief asserts that Remi "was required to consult with an attorney regarding possible aggravated perjury charges." Nash thus appears to argue that by telling Remi that perjury was a crime and having an attorney advise Remi of her rights, the trial court intimidated Remi into changing her testimony. *See Davis v. State*, 831 S.W.2d 426, 437–38 (Tex. App.—Austin 1992, pet. ref'd) (stating that it is not per se improper for a trial court to advise a witness of the penalties for false testimony but that warnings concerning the dangers of perjury cannot be emphasized to the point where they intimidate the witness into changing testimony or refusing to testify). We disagree.

After Nash's attorney objected to Remi's testimony, the trial court asked Remi if she understood that it was a crime to lie under oath, and Remi's response indicated that she had just learned that fact from the judge's question. The trial court then offered to appoint Remi an attorney to explain her rights to her, and she accepted that offer. After the break, Remi told the trial court that she had learned that her options were to remain silent, to stick to her previous testimony, or to "clear up any misrepresentation." The trial court then established that Remi understood her right to remain silent and asked her whether watching the interview video changed her testimony. After Remi admitted that the video had changed her testimony, the trial court brought the jury back, the State resumed its questioning, and Remi testified that Nash had committed the alleged offense. Nash did not object at any point during the trial court's asking Remi about her understanding of her options.

This was not a situation in which the trial court or prosecutor emphasized the warnings concerning the dangers of perjury to the point that Remi was intimidated into changing her testimony. The prosecutor did not threaten Remi with prosecution if she did not change her story, and the trial court made sure that Remi was aware that she could remain silent rather than change her testimony about the offense. The trial court's remarks to Remi were not overbearing or coercive. *See Garza v. State*, 248 S.W.3d 742, 745 (Tex. App.—Houston [1st Dist.] 2008, no pet.). An attorney had been appointed to advise her, and that attorney told her that in addition to remaining silent, she could also choose to stick to her original story or to change her testimony, if her changed testimony would be true. Under these circumstances, we cannot say that the trial court or the prosecutor acted improperly. *See id.*; *see also Lee v. State*, 639 S.W.3d 312, 318 (Tex. App.—Eastland 2021, no pet.); *Carranza v. State*, No. 04-93-00619-CR, 1996 WL 81937, at *5 (Tex. App.—San Antonio Feb. 28, 1996) (not designated for publication), *aff'd*, 960 S.W.2d 76 (Tex. Crim. App. 1998). We overrule Nash's first issue.

### C. Text Messages

In Nash's second issue, he argues that the trial court abused its discretion by allowing admission of the text messages through witness testimony.[2] He asserts that

---

[2]In one sentence in this section of his brief, Nash also argues that courts have found that a cell phone user has a reasonable expectation of privacy in the user's phone's contents. Nash does not challenge the evidence that the text messages were recovered from Remi's phone with her consent. Because Nash's brief does not

15

the trial court "failed to balance the admissibility of the hearsay testimony that substantially prejudiced [Nash] in violation of Texas Rules of Evidence 403 and 901," as well as in violation of Article I, Section 10 of the Texas Constitution and the Sixth Amendment of the federal constitution. He asserts that "by doing so, the court lowered the State's burden of proof."[3]

The State did not introduce copies of the texts as evidence, but Curtis read some of the texts to the jury, including

- July 2019 text messages calling Remi a bitch and an "African whore."

- A message threatening Remi with assault, stating, "Me and my dad gonna molest you for weeks, you African trash bitch."

- A message from the same time period stating, "Fun two years. LOL. After the divorce is final, I will be back in my seven-bedroom home with my real first love and kids' mother. It's been a long ten years."

- A message from the same time period saying, "I love you, [Remi]."

---

contain any further discussion of privacy rights, we do not read the brief to argue that the messages should have been excluded on the basis that his Fourth Amendment rights were violated when the police obtained the data from Remi's phone, and he did not raise any such argument in the trial court.

[3]Nash also argues that the admission of the evidence violated the Fourteenth Amendment of the federal constitution and Articles 19 and 29 of the Texas Constitution, but he did not object on these grounds in the trial court. *See* Tex. R. App. P. 33.1.

- A message sent about an hour after the previous message, stating: "Immigration will find you before I ever come looking for a lowlife like my wife.[4] I'm reporting you to ICE in the morning. If I don't hear from you, boo, welcome to America. LOL."

- A message saying that he would be filing for divorce the next morning and telling her that "they better deport you before we find you."

- Another message threatening Remi with immigration authorities: "Wake up, bitch. I'm back in Dallas. I put a GPS tracker on our black Toyota the first day you drove it. I know all your movements since you stepped foot in my country, you worthless slut. So don't think you're hard to find." The text continued, "I will send ICE to pick you up at any time. I'm just not done with you yet, so don't fret. GD morning, my love."

- A message stating, "Ask yourself, will you even be alive to see 45? Two days away. You better pray and pay. LOL. Only God knows that question, so don't ask Nash. He just love cash. LOL. Bye."

- A text sent at 12:46 a.m. on March 21, 2020 (i.e., a few hours after the time at which Remi said the offense had occurred), stating, "I apologize

---

[4]Some of the texts suggest that Remi and Nash were living separately at some point and that Nash did not know where she was, but there was no testimony at trial explaining those texts or, if the couple was in fact separated, why.

17

for forcing myself on you. I'm really not that typo [sic] guy. Excuse me, please."

- A message sent on April 22, 2020, stating, "No more, ever, abuse."[5]

### 1. Authentication

Nash argues that the text messages in this case were not authenticated because the State offered them through the testimony of police officers and a detective but relied only on hearsay evidence—Remi's telling the officers that the messages had come from Nash—to do so.[6] To authenticate or identify an item of evidence under

[5]Officer McAdams testified that Remi showed him a text thread with Nash and that in one of text messages, Nash had stated, "This is Kevin Nash, your loving husband." But no testimony established that the text thread seen by McAdams was the same thread about which the detective testified, so we do not rely on that testimony in our authentication analysis.

[6]The State argues that Nash did not preserve his authenticity objection because the trial court did not rule on the objection. However, Nash's attorney repeatedly objected that the text messages had not been authenticated, and the record indicates that the trial court understood and acknowledged the objections. For example, after the detective testified about determining from a database that the phone number belonged to Nash, Nash's attorney objected, "They don't have a witness saying this— I believe, they were coming from him. We've got a witness saying, I did a data check, and it says my—Accurint, or whatever that company was . . . says this is listed to him." The trial court responded, "I agree[, but i]n my humble opinion, that goes to weight versus admissibility."

Then, after Detective Curtis testified that the text messages came from the number that had been confirmed as Nash's, Nash's attorney took her on voir dire, during which the detective acknowledged that she had no way of knowing if someone else had been using Nash's phone to send the text messages. When the detective was asked to read aloud a text message from Nash to Remi, the attorney objected "as to hearsay[.] Assumes facts not in evidence, whether this is from a Kevin Nash." The trial court overruled the objection. For purposes of this opinion, we will assume that

18

Rule 901, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. Tex. R. Evid. 901. "In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims," and therefore "the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (citing *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012)).

With a text message, the association of a cell phone number with a particular person "may be quite strong," but that association alone "might be too tenuous" to link a text message to a purported author because "cell phones can be purloined." *Id.* at 601. Thus, one way a message's authenticity may be shown is through a sponsoring witness testifying to an association between a cell phone number and the purported author of the message, combined with other circumstances that "bridge the logical gap and permit a proper inference that the purported author sent the message." *Id.* at 602. The "other circumstances" may include "the message's 'appearance, contents, substance, internal patterns, or other distinctive characteristics,' which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author." *Id.* (quoting Tex. R. Evid. 901(b)(4)). "The trial

the trial court understood Nash's objection to complain that the State had not put on sufficient evidence to show that the texts were what they purported to be—messages from Nash—and that the trial court overruled it.

19

court's determination of whether the proponent has met this threshold requirement is subject to appellate review for an abuse of discretion and should not be countermanded so long as it is within the zone of reasonable disagreement." *Id.* at 600.

Detective Curtis testified about the text messages, explaining that Remi had allowed examination of her phone and that the phone had been turned over to a forensic examiner who extracted data from the phone and provided a report to Curtis showing that data. After reviewing that report, Curtis became interested in text messages on the phone from a specific phone number. As a law enforcement officer, Curtis has access to Accurint Crime Center,[7] and Curtis accessed that database to determine that Nash was the subscriber for that particular phone number. Thus, the detective's testimony established that the text messages had come from a phone number owned by Nash.

As for whether it was Nash himself who had sent the text messages, as opposed to someone else who might have had access to the phone, the messages themselves "constituted additional circumstantial evidence" of their authenticity. *See*

---

[7]LexisNexis Accurint "is a direct connection to public records to help verify identities, conduct investigations[,] and detect fraud." *In re A.A.*, 670 S.W.3d 520, 529 n.39 (Tex. 2023) (quoting the Accurint website, https://www.accurint.com). It describes its Virtual Crime Center service as assisting law enforcement agencies with "[f]inding, identifying[,] and verifying identities." LexisNexis Accurint Virtual Crime Center, https://risk.lexisnexis.com/products/accurint-virtual-crime-center (last visited August 14, 2023).

*id.* at 603–04. Multiple messages stated that the sender intended to divorce Remi, suggesting that the sender was Remi's husband, Nash. One of the texts referenced "our" vehicle. The March 21 message apologized for the sender's "forcing [him]self" on Remi, and that message was sent less than twenty-four hours after the alleged date of the sexual assault. Further, Remi offered some corroboration that the March 21 text came from Nash; she testified that after what happened on the evening of March 20, she "went to work, and [Nash] sent [her] a text message that he was sorry."

Nash argues that the State did not ask Remi about the text messages during her testimony and that Remi is the only person who could say whether or not these text messages met the standards for authentication established by the Court of Criminal Appeals. But there is no evidence that Remi sent herself the texts from Nash's phone, and unless she watched the sender type the messages sent to her, which the evidence does not support, she also would have to rely on the kinds of circumstances referenced by the Court of Criminal Appeals to testify that the texts came from Nash. In short, she was in no better position to authenticate the texts than Detective Curtis.

The evidence that the number was registered to Nash combined with other circumstances was sufficient to permit a proper inference that he sent the text messages. *See id.* at 600–01. We therefore hold that the trial court did not abuse its

discretion in admitting the text-message testimony. We overrule this part of Nash's second issue.[8]

## 2. Rule 403

Nash also challenges the text message testimony under Rule 403, but Nash did not object at trial that any of the texts were more prejudicial than probative or otherwise assert a Rule 403 objection. *See* Tex. R. Evid. 403. He states in his brief that he raised a Rule 403 objection to the texts, but he does not cite any part of the record

---

[8]Nash's brief includes a paragraph referencing hearsay, which we read as contending that McAdams's and Maloney's testimony that Remi showed them texts from her husband was hearsay, and therefore the officers' testimony could not have been used to authenticate the messages. But their testimony was not necessary to authenticate the texts, Curtis's identification of the phone's subscriber did not rely on the two officers' statements about the text messages or on Remi's out-of-court identification of Nash's phone number, and as we have explained, other circumstances linked the texts read by Curtis to Nash. To the extent that Nash argues that the text messages' content cannot be used to authenticate them because the messages themselves are hearsay, we disagree. *Butler*, 459 S.W.3d at 602; *see also* Tex. R. Evid. 801(e)(2); *Jones v. State*, 466 S.W.3d 252, 266 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding text messages from defendant were not hearsay because they were statements of party-opponent); *cf. Casas v. State*, No. 08-22-00109-CR, 2023 WL 3737119, at *11 n.3 (Tex. App.—El Paso May 31, 2023, no pet. h.) (not designated for publication) (holding same with respect to Facebook messages). Finally, to the extent that Nash's brief is separately arguing that the trial court abused its discretion by not excluding as hearsay all of the testimony referencing the text messages or Curtis's testimony about the content of the text messages, (1) it is unclear that the argument was preserved because, based on how he phrased his objections, the trial court appeared to understand him to raise authentication and Confrontation Clause objections, *see* Tex. R. App. P. 33.1; (2) to the extent the argument was preserved, it is inadequately briefed on appeal, s*ee* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); and (3) regarding the texts themselves, they were not hearsay. *See Jones*, 466 S.W.3d at 266.

where he raised that objection, and our review of the record has not revealed a Rule 403 objection. *See* Tex. R. App. P. 33.1.

Nash did object that three texts from July 2019 were not relevant,[9] but he did not object to all of the text messages on relevance grounds. Nash does not complain on appeal that the texts were not relevant, and an objection to relevance is not the same as an objection that the evidence's relevance is outweighed by one of the dangers listed in Rule 403. *See Bell v. State*, 938 S.W.2d 35, 49 (Tex. Crim. App. 1996). Because Nash's argument on appeal does not comport with his trial objection, he failed to preserve his complaint for appeal. *See id.*; *Stanley v. State*, No. 02-17-00084-CR, 2018 WL 3153542, at *5 (Tex. App.—Fort Worth June 28, 2018, pet. ref'd) (mem. op., not designated for publication); *see also Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1999) (op. on reh'g) (holding complaint not preserved when

---

[9]Specifically, Nash's attorney objected "as to these texts from 2019 July. They're . . . almost a year prior to this Indictment date, so we'd object as to the relevance." The trial court allowed the State to explain the purpose of the texts, stating that "otherwise, [it would] tend to sustain the objection at this point." The prosecutor explained that the allegations in the case involved a delayed report, and so the prosecutor was "trying to give the jury additional context into the relationship, as to why [Remi] might not have wanted to report an assault immediately, and that's based on past threats that have happened throughout the relationship." *See* Tex. Code Crim. Proc. Ann. art. 38.371 (providing that in prosecution of offense for family violence, each party may offer evidence of all relevant facts and circumstances relevant in determining whether the actor committed the offense, including evidence regarding the nature of the relationship between the actor and the alleged victim). The trial court then asked Nash's attorney for his response, given the context provided by the State. The attorney responded, "The time is pretty remote, a year prior, Your Honor. . . . We'll object to relevance." The trial court overruled the objection.

trial objection did not comport with complaint on appeal). We overrule this part of Nash's second issue.

### 3. Confrontation Clause

Finally under this issue, Nash argues that the text messages were testimonial and that their admission violated his right under the Confrontation Clause. From his brief, it is unclear whether he argues that the text messages had not been adequately authenticated to show that they were his own and thus his confrontation right was violated when he was not able to cross-examine the actual sender of the messages or that the trial court violated his confrontation right by failing to hold a separate hearing on the texts' admissibility to allow him to cross-examine Remi about the texts.

A defendant has the constitutional right to be confronted with the witnesses against him or her. U.S. Const. amend. VI; *see also* Tex. Const. art. I, § 10. Accordingly, evidence of out-of-court statements that are "testimonial" in nature are not admissible unless (1) the witness who made the statement takes the stand to be cross-examined or (2) the witness is unavailable, and the defendant had a prior opportunity to cross-examine the witness. *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). Testimonial statements are "formal and similar to trial testimony. In other words, testimonial statements are those 'that were made under circumstances [that] would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S. Ct.

24

1354, 1364 (2004)). We review de novo the trial court's ruling on whether a statement is testimonial. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

In determining whether an out-of-court statement is testimonial, "the primary focus is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations," and thus, generally speaking, a statement is testimonial "when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Crawford v. State*, 595 S.W.3d 792, 803 (Tex. App.—San Antonio 2019, pet. ref'd); *see also Nicholls v. State*, 630 S.W.3d 443, 448 (Tex. App.—Eastland 2021, pet. ref'd). "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Ohio v. Clark*, 576 U.S. 237, 249, 135 S. Ct. 2173, 2182 (2015). "Casual remarks made to friends are generally not testimonial." *Davis v. State*, 268 S.W.3d 683, 709 (Tex. App.—Fort Worth 2008, pet. ref'd).

The text messages here were sent to Nash's wife, not to law enforcement officers, and their circumstances do not indicate that their primary purpose was to establish or prove past events potentially relevant to a later criminal prosecution. Rather, the messages were sent to communicate to Remi the sender's thoughts, feelings, and threats. The messages "are informal, and their subject and method of communication" weigh against concluding that they are testimonial. *Walter v. State*,

581 S.W.3d 957, 981 (Tex. App.—Eastland 2019, pet. ref'd) (citation omitted). We hold that the trial court correctly determined that the text messages were not testimonial, and we overrule the remainder of Nash's second issue.

## II. Sufficiency

Finally, in his third issue, Nash argues that the evidence is insufficient to support the jury's guilty verdict. He contends that Remi's testimony is highly unreliable and that "[t]here is no other evidence to support the State's position that a sexual assault occurred that is not hearsay evidence."

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). When performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

### B. Evidence and Analysis

A person commits sexual assault if the person intentionally or knowingly "causes the penetration of the . . . sexual organ of another person by any means, without that person's consent." Tex. Penal Code Ann. § 22.011(a)(1)(A). As noted

above, Remi testified that on March 20, 2020, Nash held her down and, despite her telling him to stop, penetrated her vagina with his penis. Although she had initially denied that penetration happened, it was up to the jury to resolve conflicts in her testimony, determine her credibility, and weigh her testimony's probative value, and we are required to defer to the jury's determination. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

Although Nash does not specify which evidence he contends was hearsay and thus could not support the verdict, *but see Jenkins*, 493 S.W.3d at 599 (noting evidentiary sufficiency review includes inadmissible evidence), for purposes of addressing his argument, we assume that he means the text message testimony. However, the jury was entitled to believe that the March 21, 2020 text message apologizing for the sender's having forced himself on Remi was a message sent by Nash, and thus the jury could have determined that the text corroborated Remi's testimony. The only evidence that Nash did not commit the assault was Remi's initial testimony, which she recanted after being informed that perjury is a crime. Viewing the evidence in the light most favorable to the verdict, the jury could have determined beyond a reasonable doubt that Nash sexually assaulted Remi as charged. We overrule Nash's third issue.

## Conclusion

Having overruled Nash's three issues, we affirm the trial court's judgment.

27

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 31, 2023